IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Civil No. 3:21-cv-395 |
| APPROXIMATELY $37,820 IN UNITED STATES CURRENCY SEIZED FROM DANA TYRONE SCARBOROUGH ON MARCH 22, 2021 AT THE CHARLOTTE-DOUGLAS INTERNATIONAL AIRPORT | ) ) ) ) ) ) ) ) |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

NOW COMES the United States of America, Plaintiff herein, by and through William T. Stetzer, Acting United States Attorney for the Western District of North Carolina, in a civil cause of forfeiture, and respectfully states the following:

### INTRODUCTION

1. This is a civil action *in rem* against $37,820 in United States currency seized from Dana Tyrone Scarborough on March 22, 2021 at the Charlotte-Douglas International Airport (the "Currency").

2. During an interdiction operation, a trained drug detection canine positively alerted to the odor of narcotics on a checked suitcase belonging to Scarborough as it sat on a baggage cart for loading on a flight to San Francisco, a known source location of narcotics and location to which couriers transport money to pay for narcotics bound from the West Coast for the East Coast. After law enforcement approached Scarborough in the airport terminal and asked to search the suitcase, he consented to the search. A consensual search of Scarborough's suitcase revealed, *inter alia*, $37,820 in bulk currency wrapped in a cloth Gucci bag inside an outer aluminum bag. Scarborough would not identify the source of the Currency. Law enforcement seized the Currency. After law

1

enforcement had seized the Currency and placed it in a blind lineup of four boxes, a second trained drug detection canine later positively alerted to the Currency.

3. Scarborough has an extensive criminal history, including numerous charges and convictions related to the purchase and sale of cocaine and other narcotics.

4. Additionally, Scarborough's travel history is that of a drug courier. For example, from December 2020 to July 2021 (through the COVID pandemic), Scarborough traveled on multiple flights, primarily from Florida to California (a known drug source location). Airline tickets for these flights were often issued on the day of or on the day before travel and were for one-way (not roundtrip) airfare. On at least five of these trips, SCARBOROUGH returned only one or two days later from California.

5. Thus, the Currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes money furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, is proceeds traceable to such an exchange, and/or is money used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846.

**NATURE OF THE ACTION**

6. Procedures for this action are mandated by 21 U.S.C. § 881, 18 U.S.C. § 983, 19 U.S.C. §§ 1602-1621, and, to the extent applicable, the Federal Rules of Civil Procedure and accompanying Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

7. This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 and 1355. These statutes confer original jurisdiction to federal district courts of all civil actions, suits,

2

Case 3:21-cv-00395-MOC-DCK   Document 1   Filed 08/02/21   Page 2 of 13

or proceedings commenced by the United States and any action for the forfeiture of property incurred under any act of Congress.

8. Venue is proper pursuant to 28 U.S.C. § 1395 because the Currency was seized in the Western District of North Carolina.

9. The Currency has been seized and is now within the Western District of North Carolina.

10. Based on the following facts, verified by Department of Homeland Security, Homeland Security Investigations ("HSI") Special Agent ("SA") Daniel Leal, this action seeks the forfeiture of all right, title, and interest in the Currency.

## FACTS GIVING RISE TO FORFEITURE

*The interdiction*

11. On March 22, 2021, Dana Tyrone Scarborough was traveling via American Airlines on a one-way ticket issued on that day, from Tampa, Florida, connecting through Charlotte, North Carolina, *en route* to San Francisco, California. Scarborough had a carry-on bag and had checked one suitcase.

12. Meanwhile, SA Leal and HSI K9 Task Force Officer ("TFO") Kevin Osuch were conducting an interdiction operation at the Charlotte-Douglas International Airport, within the Western District of North Carolina. The operation involved, among other things, SA Leal and TFO Osuch examining luggage carts prior to their being loaded onto a plane bound for San Francisco. SA Leal and TFO Osuch had focused their interdiction efforts on flights to places such as San Francisco since San Francisco is a known source of illegal narcotics—that is, a location to which couriers transport money from the East Coast of the United States to the West Coast in exchange for illegal narcotics that have been or will be distributed in, among other locations, the

3

East Coast.

13. TFO Osuch noticed a strong odor of marijuana emanating from a suitcase which had a baggage tag attached with Dana Scarborough's name. SA Leal placed the suitcase and other suitcases in a lineup on the tarmac. TFO Osuch deployed K9 Benny, who is a certified narcotics detection canine properly trained to detect narcotics odors, including marijuana, cocaine, methamphetamine, ecstasy, and heroin.

14. K9 Benny conducted an open-air sniff of the suitcases pulled from the luggage cart for the San Francisco flight. K9 Benny alerted to the odor of narcotics on the suitcase that had the name Dana Scarborough on its baggage claim ticket.

15. Based on the noticeable odor of marijuana, the positive K9 alert, and the known narcotics destination, SA Leal and HSI SA Glenn MacDonald detained the suitcase and brought it to the boarding area of gate A8, where they located Scarborough.

16. SA Macdonald identified himself and advised Scarborough that a narcotics detection K9 alerted to his suitcase. Scarborough claimed ownership of the suitcase and advised that he had purchased his airline ticket that day. Scarborough advised that he didn't know when he was returning.

17. During the encounter Scarborough was argumentative and hostile; raising his voice, interrupting, claiming multiple times that a K9 did not alert to his bag, using profanity on multiple occasions, tossing his backpack on the ground, and communicating in an animated state. SA Macdonald advised Scarborough that he was free to go and that he didn't have to speak with law enforcement, but that law enforcement needed to resolve the narcotics K9 alert.

18. SA MacDonald asked Scarborough for consent to search his suitcase and Scarborough replied, "I don't give a fuck." Before the suitcase was searched, SA MacDonald

4

asked if a K9 could screen his backpack. Scarborough advised "I don't give a fuck." Scarborough tossed his backpack on the ground, obtained the suitcase key from the backpack, unlocked the suitcase, and tossed the lock on the ground, advising "I don't give a fuck."[1]

19. During the search of Scarborough's black suitcase, SA Leal found an aluminum bag that smelled like marijuana. SA Leal opened this aluminum bag and located a cloth Gucci bag. SA Leal opened the Gucci bag and located bulk currency. SA MacDonald asked Scarborough how much he had in that bag and Scarborough advised he didn't know. SA MacDonald asked if it was his money and Scarborough didn't reply to this question. SA Macdonald asked if someone had given him the money and Scarborough didn't reply to this question. Later, Scarborough advised that he thought he had approximately $40,000 dollars in that bag. The suitcase and Currency are pictured as follows:



20. SA MacDonald advised Scarborough that the Currency would be seized and briefly explained the process for Scarborough to petition for return of the Currency. SA MacDonald

---

[1] In addition to the K9 alert and consent providing bases for the searches, one of the standard conditions of American Airline's conditions of carriage is that "[t]o fly on American, you must . . . [a]llow your baggage to be inspected by Customs, the TSA or other government officials" and "[a]llow you and your bags to be searched for explosives, dangerous weapons or banned substances." *See* https://www.aa.com/i18n/customer-service/support/conditions-of-carriage.jsp?anchorEvent=false&from=footer

asked Scarborough if the address on his license was valid so that the Department of Homeland Security could forward paperwork to Scarborough to assert an interest in the Currency. Scarborough said yes but advised that the gate attendant had his license. The gate attendant who was nearby advised that she did not have the license and that Scarborough had it. Law enforcement asked Scarborough if he wanted to provide an address for the petition paperwork, to which he said that law enforcement could "keep it" (giving law enforcement the impression that he was talking about the currency). Scarborough was asked if he wanted to provide a telephone number, but Scarborough did not answer and walked away.[2]

21. Later that day, at the CMPD airport office, law enforcement placed the Currency in a second blind line-up in one of four scent boxes. K9 Officer Bynoe deployed K9 Alvin, who is a properly trained and certified narcotics detection canine, trained to detect narcotics odors including marijuana, cocaine, methamphetamine, ecstasy, and heroin. K9 Alvin conducted an open-air sniff of the four scent boxes, only one of which contained the Currency. K9 Alvin positively alerted to the scent box containing the Currency seized from Scarborough.

22. Law enforcement transported the Currency, totaling $37,820, to Loomis, where it was counted and deposited into an account established to hold seized funds. When found, the Currency was rubber-banded in bundles and consisted of 116 one hundred-dollar bills, 232 fifty-dollar bills, and 731 twenty-dollar bills.

***Scarborough's Criminal History Involving Narcotics***

23. Law enforcement conducted a check of convictions of and charges against Scarborough. To-date, based on state and federal records, law enforcement has determined the

---

[2] Scarborough later contacted Charlotte Mecklenburg Police Department (CMPD) airport office and asked that law enforcement contact him regarding the seized Currency. SA MacDonald contacted Scarborough, who provided the address for the Department of Homeland Security to forward paperwork on claiming the Currency.

following.

24. On August 11, 1992, Scarborough was charged with possession of and possession with intent to sell cocaine in Hillsborough County, Florida.

25. On August 21, 1992, Scarborough was charged with aggravated stalking in Hillsborough County, Florida. The complainant stated that Scarborough was "constantly selling narcotics" in front of his house and he asked Scarborough to stop the activity and to stop disrespecting his property. As a result, Scarborough began to threaten and harass the complainant and his family, including but not limited to threats on several occasions to burn down the complainant's home and cause serious bodily injury.

26. On March 15, 1993, Scarborough was convicted in Hillsborough County, Florida of cocaine possession.

27. On July 29, 1993, Scarborough was charged with possession of cocaine in Hillsborough County, Florida. Scarborough was arrested after law enforcement determined that Scarborough was trying to arrange the purchase of a gun in exchange for cocaine.

28. On September 28, 1993, Scarborough was convicted in Hillsborough County, Florida of cocaine possession.

29. On August 15, 1996, Scarborough was sentenced to be imprisoned for a term of 270 days after entering a plea of nolo contender to possession of cocaine.

30. On January 1, 2000, Scarborough was arrested and charged with possession and trafficking of cocaine in Hillsborough County, Florida. For that arrest, Scarborough was convicted on September 26, 2000 in Hillsborough County, Florida for possession of cocaine with intent to sell, possession of cannabis, and possession of drug paraphernalia.

31. On July 5, 2004, Scarborough was arrested and charged with possession of cocaine

and trafficking in cocaine in Hillsborough County, Florida.

32. On December 13, 2004, Scarborough was arrested and charged with trafficking in cocaine and conspiracy to traffic cocaine in Hillsborough County, Florida.

33. On August 22, 2007, Scarborough was arrested and charged with trafficking cocaine in Hillsborough County, Florida.

34. On January 28, 2008, Scarborough was convicted of trafficking cocaine in Hillsborough County, Florida.

35. On January 28, 2008, Scarborough entered a plea of guilty to aggravated assault on law enforcement in Hillsborough County, Florida.

36. On October 29, 2014, Scarborough was arrested and charged with trafficking in cocaine and conspiracy to traffic cocaine in Hillsborough County, Florida.

37. On March 30, 2017, Scarborough was arrested and charged with conspiracy to traffic amphetamine in Hillsborough County, Florida.

38. Scarborough's criminal history involving narcotics suggests that, for decades, he has engaged in the business of trafficking in narcotics, and derived income and carried currency from same.[3]

***Scarborough's suspicious travel history***

39. California is a known source of narcotics for distribution elsewhere.

40. Illegal narcotics operations often operate in a business environment in which banks will not service their needs and, as, as a result, such narcotics operations engage in cash intensive business.

41. Couriers routinely carry cash from the East Coast to the West Coast to reimburse

---

[3] Scarborough's extensive criminal history spanning 25 years also includes convictions for assault and aggravated assault with weapons, not just narcotics convictions.

8

Case 3:21-cv-00395-MOC-DCK   Document 1   Filed 08/02/21   Page 8 of 13

West Coast narcotics suppliers for narcotics previously supplied to East Coast narcotics sellers and/or to purchase more narcotics.

42. Scarborough's travel history fits a travel history of a money courier transporting proceeds, from the sale of narcotics in East Coast states, to the West Coast to purchase yet more narcotics.

43. From December 2020 to July 2021—through the COVID pandemic—Scarborough travelled between Florida and California, primarily but not exclusively on American Airlines.

44. Specifically, based on investigation to-date, from December 2020 through July 2021, Scarborough was booked on no less than twenty-one flights involving travel to or from California. Although investigation is ongoing, HSI estimates that these twenty-one flights reflect at least approximately ten to eleven trips by Scarborough from Florida to California and back, either via flights to and from California or some combination of car and air travel between Florida and California. On no less than four occasions on which HSI has obtained records, Scarborough returned via airplane to Florida only one day after arriving via airplane in California, and, on at least one occasion, Scarborough returned to Florida only two days after arriving in California. Scarborough spent approximately $4,150 for the purchased tickets. According to flight information obtained to-date, Scarborough traveled as follows:

- Departed from San Francisco, CA (SFO) to Tampa, FL (TPA) on December 23, 2020.
- Departed from TPA to Los Angeles, CA (LAX) on January 7, 2021.
- Departed from Ontario, CA (ONT) to TPA on January 8, 2021.
- Departed from LAX to Sacramento, CA (SMF) on January 12, 2021.
- Departed SFO to TPA on January 21, 2021.
- Departed Orlando, FL (MCO) to Sacramento, CA (SMF) on January 31, 2021.

- Departed LAX to MCO on February 4, 2021.

- Departed MCO to SMF on February 9, 2021.

- Departed SMF to MCO on February 10, 2021.

- Departed MCO to LAX on February 18, 2021.

- Departed MCO to SMF on February 25, 2021.

- Departed SMF to MCO on February 26, 2021.

- Departed MCO to SMF on March 2, 2021.

- Departed SFO to MCO on March 3, 2021.

- Departed MCO to SMF on March 09, 2021.

- Departed SMF to MCO on March 11, 2021. On this March 11, 2021 trip, Scarborough traveled with Roland Griffin, who has previously been convicted of several narcotics crimes.

- Departed LAX to MCO on March 19, 2021.

- Departed TPA to CLT on March 22, 2021.

- <u>The travel at the time of seizure</u>: CLT to SFO on March 22, 2021. Purchased but not used.

- Departed SMF to TPA on April 12, 2021.

- Departed TPA to SMF on April 14, 2021.

- Departed TPA to SMF on July 21, 2021.

45. Scarborough's short turn arounds and one-way tickets purchased on the day of or the day before travel for his flights from Florida to California are travel patterns indicative of those involved in transporting illicit proceeds or drugs via commercial airline.

## FIRST CLAIM FOR RELIEF – THE $37,820 IN CURRENCY
## (21 U.S.C § 881(a)(6))

46. The United States incorporates by reference the allegations set forth in the paragraphs above as if fully set forth herein.

47. The $37,820 in Currency is subject to forfeiture pursuant to 21 U.S.C. § 881 (a)(6) because it constitutes money furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, is proceeds traceable to such an exchange, and is money used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846.

## CONCLUSION AND PRAYER FOR RELIEF

48. By virtue of the foregoing, all right, title, and interest in the Currency vested in the United States at the time of the commissions of the unlawful act giving rise to forfeiture, 21 U.S.C. § 881(h), and has become and is forfeitable to the United States.

WHEREFORE, the United States of America respectfully prays the Court that:

1. A warrant for the arrest of the Currency be issued;

2. Due notice be given to all parties to appear and show cause why the forfeiture should not be decreed;

3. Judgment be entered declaring the Currency to be condemned and forfeited to the United States of America for disposition according to law; and

4. The United States be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action, including but not limited to the expenses of maintenance and protection of the Currency as required by 28 U.S.C. § 1921.

Respectfully submitted this 2nd day of August, 2021.

>WILLIAM T. STETZER
>ACTING UNITED STATES ATTORNEY
>
>**s/ Benjamin Bain-Creed**
>Florida Bar # 0021436
>Assistant United States Attorney
>Suite 1650, Carillon Building
>227 West Trade Street
>Charlotte, North Carolina 28202
>Telephone: (704) 344-6222
>Email: benjamin.bain-creed@usdoj.gov

## VERIFICATION

I declare under penalty of perjury that the factual information contained in the foregoing Complaint is true and correct according to the best of my knowledge, information, and belief.

Executed on the 02 day of August, 2021.

_____
Special Agent Daniel Leal
Department of Homeland Security,
Homeland Security Investigations